**Elmer G. PRATT, Plaintiff,**

v.

**William H. WEBSTER et al., Defendants.**

Civ. A. No. 78–1688.

United States District Court, District of Columbia.

Feb. 12, 1981.

As Amended Feb. 25, 1981.

---

William H. Schaap, Washington, D.C., for plaintiff.

John D. Bates, Diane M. Sullivan, Washington, D.C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge.

The plaintiff, Elmer G. Pratt, has filed this proceeding against the Federal Bureau of Investigation (FBI or Bureau) relying upon the provisions of the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. He requests records pertaining to him or retrieved during the course of conducting a search under his name. Pratt is the former Deputy Minister of Defense for the Southern California Branch of the Black Panther Party (BPP). He is currently serving a life sentence at San Quentin Prison arising from convictions of murder and robbery in a State of California court. The plaintiff maintains innocence of these crimes and that the FBI has custody and possession of various documents that would establish his contention. He relied upon an alibi defense at his state court trial and claimed that at the time of the crimes for which he was convicted, he was elsewhere—attending a meeting with Black Panther Party officials in Oakland, California. The crimes occurred in Santa Monica, California, several hundred miles removed.

This proceeding has generated a staggering number of documents. The FBI has identified more than 1,000 documents, most several pages in length, in response to the plaintiff's request. These documents refer to Pratt by name or by one of three aliases: "Geronimo", "G" and "GEE". While most of the documents were released, some were withheld in their entirety. Substantial portions of many of the documents have been deleted.

Based upon the documents released and two Vaughn indexes [1] filed in this proceeding, the Bureau has moved for summary judgment. In the latest index withholdings are based on exemptions (b)(1), (2), (7)(C), (7)(D), (7)(E) and (7)(F) of the FOIA. After a review of the application of these exemptions, as well as the memoranda of points and authorities and affidavits of the parties, the Court concludes that grant of summary judgment to the Bureau is inappropriate. The Court also rules that documents with deletions based on alleged national security grounds, exemption (b)(1), and to protect investigative methods, exemption (b)(7)(E), shall be submitted for an *in camera* inspection; that documents involving FBI counter-intelligence program activities redacted under exemption (b)(7), shall be disclosed in their entirety; and that the Bureau shall submit, as explained infra at 19–23, additional justification, explanation and clarification of certain aspects of the scope of its search.

## BACKGROUND FACTS

On June 5, 1976 Pratt filed a FOIA/Privacy Act request with FBI Director Clarence Kelley for:

All files, records, memoranda, or other data or materials filed under my name or obtainable by your agency by searching through other files and materials for documents which contain my name.

On May 20, 1977, 499 pages of redacted material were released to him. Pratt appealed certain deletions within the Bureau. He also requested a second search of specific FBI files, electronic surveillance indexes, identification records and information outside the time frame of records already provided.[2] More documents were released as a result of Pratt's appeal of the first request and the initial disposition and appeal of his second request.[3] This litigation resulted because Pratt and his counsel considered that

---

1. *See Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

2. Letter from Pratt's attorney, Mary O'Melveny to FBI Director Kelley, September 8, 1977, Complaint Ex. V.

3. Letter of Allen McCreight, Chief, FBI Free-

the deletions made in the released documents did not comply with the FOIA and judicial determinations construing its scope.

Following the Court's instruction, the Bureau submitted an affidavit indexing its exclusions in accordance with the *Vaughn* requirements. The Court determined that the indexing was inadequate and that a more refined submission was required. A revised index was filed in November 1979.

The Bureau has moved for summary judgment, relying on the adequacy of this second Vaughn index. In opposition, Pratt alleges that: the revised index is still inadequate; the Bureau cannot invoke a (b)(7) exemption to redact any of the documents because of the illegal nature of the FBI activities as to him; and, in any event, the Bureau has failed to conduct a thorough and complete search for the requested documents. In turn, Pratt requests the Court to order discovery; that the FBI continue and exhaust its search; and that it file a supplemental Vaughn index.

In the remaining portion of this Opinion, a description of the Bureau's revised index will be presented followed by a discussion and analyses of the arguments in opposition to the government's motion.

## THE REVISED VAUGHN INDEX

The Bureau's November, 1979 index is comprised of affidavits of two FBI Special Agents, David Byerly and Philip Cook. Byerly, a supervisor in the FOIA/Privacy Act Branch of the Bureau, provided an affidavit explaining each deletion from every document released.[4] His affidavit was supplemented by a sworn submission of Special Agent Philip Cook. Assigned as a classifier of FBI national security material, Cook's affidavit provided an explanation of all information deleted in the interest of national security under FOIA exemption (b)(1).[5]

The voluminous documentation of Pratt's activity that has been identified by the Bureau is a result of extensive investigations into his activities and activities of other organizations, such as the Black Panther Party, that he has had some relationship to. Six main files were maintained on Pratt, as well as "see" or cross references to him in files of other objects of FBI investigations. Electronic surveillance records of Pratt, resulting from wiretaps of various BPP offices were also compiled. These documents were indexed in twenty-one volumes.

The six main files concerned national security, bank robbery conspiracy, passport falsification, fugitive status, and theft of government property. The Bureau released the national security file on the plaintiff in five volumes. These documents, 1 through 156, were listed as volumes AA(1) through AA(5) of the Vaughn index.[6] The documents covered an investigation based on information that Pratt was allegedly engaged in activities violative of certain provisions of Title 18 of the United States Criminal Code, including inciting rebellion or insurrection, conspiring to overthrow the government, and advocating the overthrow of the government. The documents, dating from January 1, 1969 to October 1, 1976, contain detailed and graphic reports on Pratt's activities.

Because of concern that Pratt may have been involved in bank robberies, the Bureau maintained a bank robbery conspiracy file, indexed as documents 157 through 159 in volume BB.[7] Document 159 closes that investigation by concluding that there was no information on any BPP involvement in plotting bank robberies.

Records relating to an investigation into possible passport falsification were released

dom of Information and Privacy Acts Branch to Mary O'Melveny, December 19, 1977, Complaint Ex. VII; Letter of Quinlin Shea, Director, Office of Privacy and Information Appeals to Mary O'Melveny, January 4, 1978, Complaint Ex. IX; Letter of Allen McCreight to Mary O'Melveny, March 14, 1978, Complaint Ex. XI.

4. Affidavit of David Byerly, filed November 28, 1979.

5. Affidavit of Philip Cook, filed November 28, 1979.

6. Affidavit of David Byerly, ' (4)(A).

7. *Id.* ' (4)(B).

as documents 160 through 171 in volume CC.[8] Another file was maintained on the FBI's investigation into Pratt's fugitive status from August 1970 until he was apprehended in December 1970.[9] This file is composed of documents 172 through 195 in volume DD. The Bureau compiled documents 196 through 220 in volume EE on Pratt pursuant to an investigation into rioting and possession of firearms.[10] The sixth main file on Pratt contains records from a theft of government property investigation.[11] These are documents 221 through 278 in volume FF.

The remaining records identified in the revised index fit into three categories. The first consists of four volumes containing "see" or cross references to Pratt in other files. These documents, 279 through 657a in volumes GG through JJ, are identifications of Pratt contained in the main files of other individuals or organizations that were the subject of FBI investigations.[12] Records pertaining to the Bureau's electronic surveillance tapes—referred to as "ELSUR Logs"—of BPP offices are the second category. These are documents 658 through 1233 in volumes KK through PP.[13] The final category consists of letters from FBI Director Hoover to the Attorney General requesting authorization to conduct wiretapping of various BPP offices and one BPP member. These are documents 1234 through 1239 in volume QQ.[14] No deletions were made in this last volume of the index.

## LEGAL ANALYSIS

[1, 2] The Freedom of Information Act requires a *de novo* review by the district court reviewing an agency's decision to withhold documents. A document or a portion thereof can only be withheld from the requester if the information redacted falls within one of nine enumerated exemptions. 5 U.S.C. § 552(b).

 The burden is on the agency to demonstrate that the deleted material has been properly withheld. *Holy Spirit Association for the Unification of World Christianity v. Central Intelligence Agency,* No. 79–0151, slip op. 12–14 (D.C.Cir., Dec. 23, 1980); *Baez v. United States Department of Justice,* 647 F.2d 1328, at 1335 (D.C. Cir., 1980); *Lesar v. United States Department of Justice,* 636 F.2d 472, 486 (D.C. Cir., 1980). These recent decisions also support the proposition that affidavits by responsible agency personnel, where complete, are to be accorded substantial weight by the Court. *Baez,* at 1335; *Lesar* at 481. Affidavits are complete if they demonstrate with reasonable specificity that the withheld material falls within the claimed exemption. *Allen v. Central Intelligence Agency,* 636 F.2d 1287, at 1292 (D.C.Cir., 1980). Thus, the agency is entitled to summary judgment "if the description in the affidavits logically falls within the claimed exemption and if the information is neither controverted by contrary evidence in the record nor by evidence of agency bad faith." *Baez,* at 1335; *see Lesar,* at 481.[15]

### Exemption (b)(1)

The (b)(1) exemption, 5 U.S.C. § 552(b)(1), protects from disclosure matters that are

8. *Id.* ¶ (4)(C).

9. *Id.* ¶ (4)(D). These documents concern Pratt's activities and location during that period. Some of these documents are duplicates of material provided in other volumes.

10. *Id.* ¶ (4)(E).

11. *Id.* ¶ (4)(F).

12. *Id.* ¶ (7)(I).

13. *Id.* ¶ (8)(A). Electronic surveillance was conducted on BPP offices in Berkeley, Chicago, Los Angeles, New York and San Francisco.

*See* Documents 1234–1239. A few of the documents in the ELSUR Log volumes are materials from see reference files.

14. *Id.* ¶ (9).

15. Pratt does not challenge the Bureau's response to his document request under the Privacy Act. 5 U.S.C. § 552a. That provision limits public disclosure of individual records, but makes them available to the subject of those records. *Id.*

"(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." Executive Order 12065 currently governs classifications on national security grounds. 3 C.F.R. 190 (1979). Classified documents must be designated "top secret", "secret", or "confidential".[16] Sixty-four documents were redacted under the Executive Order. The deletions are indexed on the cover page for each document and are also reviewed, document-by-document, in the Cook affidavit.

■ Information withheld under exemption (b)(1), must satisfy both the procedural and substantive criteria of the Executive Order. The procedural criteria require that the classified document show:

(a) the identity of the original classifying authority;

(b) the office or origin;

(c) the date or event for declassification review; and

(d) one of the three classification designations [discussed supra at note 16].

section 1–501. The substantive criteria under section 1–301 require that the information pertain to one of the following subject areas of national security concern:

(a) military plans, weapons, or operations;

(b) foreign government information;

(c) intelligence activities, sources or methods;

(d) foreign relations or foreign activities of the United States;

(e) scientific, technological, or economic matters relating to the national security;

(f) United States Government programs for safeguarding nuclear materials or facilities; or

(g) other categories of information which are related to national security [as determined by the President or other designated officials].

With respect to the procedural requirements, agent Cook alleges that all the classified documents have been properly designated either secret or confidential, and that each bears the name and date of the classifying authority, office of origin and the date of declassification review.[17] The index sheet of each document provides all of this information except the office of origin and the date of declassification review.

Although exemption (b)(1) requires "both procedural and substantive conformity for proper classification," Lesar, at 485, "procedural defects do not necessarily require the document to be disclosed," Allen, at 1292 n. 27. However, where a procedural defect is of such magnitude that it casts the Bureau's classification decision in doubt, an in camera inspection may be warranted. Lesar, at 485. Here the failure to provide the office of origin and date of declassification review do not cause such doubt, as might the failure to designate the document as classified or to identify the classifying authority.

However, the Court must also examine the agency's substantive classification under E.O. 12065 to determine whether the information logically "fits within one of the seven enumerated categories and whether unauthorized disclosure could be expected to cause the requisite harm" required to be properly classified. Baez, at 1334. The Bureau alleges that the deleted material fits into three of the seven categories: "foreign government information," "intelligence activities, sources or methods" or "foreign relations activities of the United States." Section 1–301(b), (c), (d).

Fifty-seven documents are redacted—usually paragraphs or portions of paragraphs—to protect "intelligence activities,

---

16. Exec. Order 12065, §§ 1–102, 1–103, 1–104, 3 C.F.R. 190, 191 (1979). The difference in classification depends upon the degree of damage to national security that would allegedly result from disclosure: "exceptionally grave" damage for disclosure of top secret information, "serious" for secret information, and "identifiable" for confidential information. Id.

17. Affidavit of Philip Cook, ¶ (6).

sources and methods." Most of these excisions are made because they allegedly contain identifiers of intelligence sources who provided information on Pratt, although some of these deletions are made to protect intelligence methods. Four documents contain deletions of information concerning foreign relations. Three of these documents concern cooperation with foreign police.[18] The fourth is redacted because it involves a "specific foreign relations matter concerning a Pratt associate."[19] The remaining three documents were excised to protect foreign government information.[20] These were classified confidential by the foreign governments which provided them. Cook claims that a more detailed disclosure or description of the documents would damage the national security interest involved.

Agent Cook's affidavit also explains in considerable detail the type of harm that would result from disclosure of this information. As to disclosure of intelligence sources and methods, such damage includes harm to the information source, allowance of counterintelligence measures by "hostile entities," and "creation of an overall chilling effect on intelligence activities."[21] As to foreign relations, further disclosure could cause a break in diplomatic relations, disclose an intelligence interest in a foreign country or compromise cooperative personnel.[22] And the release of information classified as confidential by a foreign government is presumed under section 1–303 of the Order to cause at least identifiable damage to national security.

■ The Bureau is entitled to summary judgment on its exemption (b)(1) claim if its affidavits describe with "reasonable specificity" the undisclosed portions of the documents and the justification for nondisclosure. *Allen,* at 1293; *Baez,* at 1335. Just what constitutes "reasonable specificity" as to (b)(1) deletions is a matter of some disagreement in our Court of Appeals. While the *Baez* court, at 1335, found. FBI averments that portions of documents were "classified to avoid disclosure of an intelligence method or a confidential source" to be reasonably specific, a nearly identical justification in the Central Intelligence Agency's affidavit in *Allen* led the court to conclude, at 10–11, that these were "expansive phrases" requiring the district court to conduct an *in camera* inspection. The document descriptions provided by the Cook affidavit appear to be of the same degree of specificity as those in *Baez.* However, in this Court's view, they fall far short of the requirements for summary judgment in *Allen.* Indeed, although the Court of Appeals in *Allen* did not enumerate what might be a reasonably specific description in a (b)(1) Vaughn index, the conclusion is inescapable on the facts in this case that no affidavit short of total disclosure would meet the Court's standard. In accordance with *Allen,* and mindful of the interest in avoiding "abandonment of the trial Court's obligation under the FOIA to conduct *de novo* review," *Allen,* at 1294, the Court determines that the Bureau's withholdings under exemption (b)(1) should be examined *in camera.*

### Exemption (b)(2)

■ The (b)(2) exemption, 5 U.S.C. § 552(b)(2), excludes from disclosure information "related solely to the internal practices of an agency". The Byerly affidavit asserts that the Bureau excised "informant symbols and other confidential source identifying information" throughout the documents released to Pratt under this exemption. These exclusions, however, are not itemized in the Bureau's index. Plaintiff does not object to this failure to itemize but does argue that source identifying information cannot be withheld under subsection (b)(2). The (b)(2) material is also excised under (b)(7)(D) to protect the identities of confidential sources.

18. Docs. 102, 323, 354. Doc. 102 was deleted in its entirety.

19. Doc. 529.

20. Docs. 407, 591A, 621.

21. Affidavit of Philip Cook, ¶ (5).

22. *Id.*

In *Lesar*, at 486–487, our Court of Appeals upheld the FBI practice of removing informant code identities from released documents. Thus, the information was properly withheld from Pratt. Because this information is also protected from disclosure under exemption (b)(7)(D), it is unnecessary to order an indexing of (b)(2) deletions to bring them within the requirements of an adequate Vaughn index.

### Exemption (b)(7)(C)

■ The (b)(7)(C) exemption protects "investigatory records compiled for law enforcement purposes," from disclosure that would "constitute an unwarranted invasion of privacy." 5 U.S.C. § 552(b)(7)(C). Determining the applicability of this exemption requires the Court to "balance the privacy interest involved against the public interest in disclosure." *Baez*, at 1337; *see Department of the Army v. Rose*, 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976) (applying this balancing test to privacy claims under exemption (b)(6)). The exemption was invoked to delete portions of documents throughout volumes AA(1) to PP.

The Byerly affidavit and the detailed index reveal that the Bureau withheld three types of information under the exemption:

(1) Names of FBI agents and Bureau clerical staff,

(2) Names of non-federal law enforcement personnel, and

(3) Information regarding investigations into third parties.[23]

Each category will be considered separately.

### (1) Names of FBI Personnel

■ Withholding of the identities of FBI agents and support personnel was thoroughly documented. The justification was that deletion is required to protect agents and clerical staff from needless publicity leading to possible harassment and exposure to threats, reprisals, ridicule or ostra-

cism. The Byerly affidavit establishes the necessary logical nexus between nondisclosure and the exemption. Although an agent's interest in privacy is not as strong as that of a private citizen, "the agent by virtue of his official status does not forego altogether any privacy claim in matters related to official business." *Lesar*, at 487. Here the interest of both the agents and Bureau clerical staff in minimizing public exposure and harassment outweighs the public interest in ascertaining their identity. *See Baez*, at 1339; *Lesar*, at 488.

### (2) Names of Nonfederal Law Enforcement Personnel

■ The Bureau also deleted the names of state and municipal police officers from law enforcement reports submitted by their agencies in the course of the FBI investigation of Pratt. The affidavit and accompanying index again establish a clear nexus between this material and the exemption invoked. Such persons have at least as great an interest in privacy as FBI personnel whose identities are likewise protected. Nondisclosure is warranted and proper under the circumstances.[24]

### (3) Information on Third Parties

■ Throughout the index information has been withheld about persons who were subject to investigation or who, in the course of other Bureau probes, may have been considered for investigation. This information has been disclosed to the extent it is publicly known or innocuous. Relying on its duty to weigh a person's privacy interests against the public's right to information, however, the agency withheld information based on the following criteria:

Where it was felt that the release of certain information would announce to the world that an individual was a target of an FBI investigation and, therefore, derogatory inferences might be drawn

---

**23.** Affidavit of David Byerly, ¶ (6)(C)(iii).

**24.** Information identifying FBI agents and other law enforcement personnel was also withheld

under exemption (b)(7)(F), to protect the safety of law enforcement personnel. Because this information is exempt under (b)(7)(C), the Court need not reach the (b)(7)(F) claim.

therefrom, the information, the name, and data have been deleted to protect his privacy. Where the information was highly personal, defamatory or embarrassing to the third person, it was also withheld pursuant to exemption (b)(7)(C).[25]

The *Baez* court upheld nondisclosure of similar information, concluding that release would be the clearest example of an unwarranted invasion of privacy. Since the Byerly affidavit and the indexing of these exclusions throughout the documents conform to the requirements for an adequate Vaughn index, they are proper.

### Exemption (b)(7)(D)

█ This subsection exempts law enforcement investigatory records where disclosure would

> disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source.

5 U.S.C. § 552(b)(7)(D). The Byerly affidavit avers that five types of information have been deleted from documents in accordance with these requirements:

a. Identities and information from persons interviewed on an implied basis of confidentiality;

b. Identities and information received from persons interviewed upon an express assurance of confidentiality;

c. Identities and information received from regular informants;

d. Informant symbol numbers (*see* discussion *supra* at 11);

e. Information furnished by local, state and foreign agencies.[26]

Defendants' Vaughn index details each type of material deleted for each relevant document. The nature of the deleted material is often explicitly stated in the remaining portions of the documents or is ascertainable from its context. In several instances, considerable portions of documents are deleted and the actual nature of the withheld material is not ascertainable. Because the Byerly affidavit and the accompanying index merit substantial weight, the Court concludes that these withholdings are proper under exemption (b)(7)(D).[27]

In *Lesar*, at 492, the court noted that the focus of its analysis was on determining whether the information was supplied by a confidential source. "Once that question is answered in the affirmative, all such information obtained from the confidential source receives protection." The affidavits properly index the material for which the exemption was invoked. In all five categories for the claimed exemption the defendant has established the confidentiality of the source.[28]

### Exemption (b)(7)(E)

█ Deletions were made from documents 79 and 192 by virtue of 5 U.S.C. § 552(b)(7)(E) to protect law enforcement investigatory records where release would "disclose investigatory techniques or procedures." One paragraph of each document was withheld from Pratt under this exemption. There is no description of the information withheld beyond the Bureau's averment that it excised investigatory material which would reveal FBI research methods. Byerly's affidavit simply states that further description of the technique would disclose its nature and diminish its current use by the FBI. Beyond the basic principles articulated by our Circuit Court for review of agency actions there is little authority on the scope of exemption (b)(7)(E). Two dis-

---

**25.** Affidavit of David Byerly, ¶ (6)(C)(iii).

**26.** *Id.* ¶ (6)(D).

**27.** This conclusion does not apply to the counterintelligence program documents discussed *infra* at 15–17.

**28.** As to confidential source information furnished by local and state agencies, *Lesar*, at 491, and *Baez*, at 1340, hold that these entities are properly comprehended as sources under (b)(7)(D). It is logical to read this holding as applying to foreign agencies as well.

trict courts have supported nondisclosure under the exemption where there has been some description of the type of investigatory information withheld. *See Malloy v. Department of Justice*, 457 F.Supp. 543, 545 (D.D.C.1978) (FBI information about money, bank security devices and investigative leads exempt); *Ott v. Levi*, 419 F.Supp. 750, 752 (E.D.Mo.1976) (laboratory reports on FBI investigation into cause of hospital fire exempt to prevent arsonist's discovery of detection methods).

The descriptions provided to the plaintiff here are far short of the detail found in *Malloy* and *Ott.* Warning of the danger of providing any further description, the Byerly's affidavit excuses this shortcoming. This statement is far too general and wide sweeping. Accordingly, it is rejected and documents 79 and 192 shall be submitted for *in camera* inspection.

*Applicability of the (b)(7) Exemption Absent a Law Enforcement Purpose*

█ A policy question is triggered by the plaintiff's contention that the Bureau cannot properly invoke the (b)(7) exemption and withhold his document request because the records were not compiled for law enforcement purposes. He argues that public knowledge of the FBI's illegal counterintelligence or "Cointelpro" activities against him and the Black Panther Party undermines any claim that these documents were compiled pursuant to a legitimate law enforcement investigation. He then urges that defendants have failed to carry its burden of establishing that (b)(7) may be used to redact documents released to him.

The documents and supporting affidavits have been reviewed and it appears that all

of the documents indexed by the FBI, except nine, evince a law enforcement purpose. As to the others, the government has met its burden and the (b)(7) exemption is proper. The ten excepted documents,[29] are identified as FBI "Counterintelligence Program" or "Cointelpro" records. They cannot reasonably be considered or interpreted as generated through any legitimate law enforcement purpose.

The documents consist of correspondence between the Los Angeles and Washington, D.C. FBI offices regarding proposals to: (1) circulate a fictitious underground newspaper in Los Angeles's black communities designed to foment distrust and suspicion of the Black Panther Party; (2) encourage certain unidentified BPP members to condemn party leaders for expelling Pratt from the Party; (3) circulate letters among numerous BPP leaders allegedly from party members criticizing other leaders in an effort to splinter party leadership.[30] The government applies exemption (b)(7)(C) and (D) to withhold portions of these documents.

These documents cannot be redacted pursuant to exemption (b)(7). As our Circuit Court recently stated in *Abramson v. Federal Bureau of Investigation*, No. 79–2500, slip op. at 11 (D.C.Cir., October 24, 1980), "[t]he threshold inquiry regarding any document for which a section (b)(7)(C) exemption is claimed is whether such document has been shown to be an investigatory record, . . . 'compiled for law enforcement purposes.' "[31] This Court reads *Abramson* as applying to exemption (b)(7)(D) as well as (b)(7)(C). Since the government has failed to establish a law enforcement purpose in

---

**29.** These documents include letters or memoranda and are number 22 in volume AA and numbers 519, 520, 521, 521a, 522, 522a, 523, and 524 in volume II. Plaintiff does not refer to these documents in support of his claim.

**30.** Documents 22, 520, 521, 521a, 522, 522a, and 524. Document 519 reports FBI knowledge of the practice of the Los Angeles BPP to tape some of their meetings. Document 523 contains no deletions.

**31.** Two other circuits, however, have concluded that exemption (b)(7)'s use of the term "law enforcement purposes" is as much a designation of the type of agency compiling the records as the activity which generated those records. *Kuehnert v. FBI*, 620 F.2d 662, 666–67 (8th Cir. 1980); *Irons v. Bell*, 596 F.2d 468, 474–76 (1st Cir. 1979). The *Irons* court went on to provide that "documents lacking even a colorable claim to [a] law enforcement purpose," could be redacted in accordance with exemption (b)(7). 596 F.2d at 472, 475.

compiling documents 22 and 519 through 524, it cannot employ exemption (b)(7) to excise portions thereof. Defendant shall release these documents to plaintiff free of any deletions.

### Additional Documents Withheld

The Bureau withholds portions of documents 221 through 1233 without invoking a specific exemption. The cover index page simply notes that the excluded portions were deemed outside the scope of plaintiff's request. These documents include the Bureau's theft of government property file,[32] "see" reference files,[33] and the FBI's ELSUR Logs.[34]

Section 552(a)(3) of FOIA contemplates disclosure of documents, or "records," pursuant to a request. Where an agency identifies a requested document, it cannot satisfy the statute merely by providing only the information contained in the document that it deems relevant. Portions of documents can be withheld only pursuant to specific, enumerated exemptions.

Although Pratt has objected to specific exemptions invoked by the FBI, he has not objected to this withholding of documents that the Bureau deems outside his request. The absence of any objection indicates that Pratt considers the portions disclosed sufficient to satisfy his request. Further disclosure is not sought. In light of this, the Court finds it unnecessary to order the FBI to reexamine and reindex the documents in volumes FF through PP.

### Scope of the Bureau's Search

Plaintiff asserts two objections to the scope of the FBI's search for records related to him: (1) the Bureau failed to search its field offices in spite of its duty to do so;

and, (2) the review of FBI central files did not disclose all of the requested documents.

### (1) Failure to Search Field Offices

[16] During the course of the plaintiff's administrative appeals he was notified that record searches were not undertaken at FBI field offices. He was instructed to make a separate request to each field office he desired searched. However, he was advised that all significant information was kept in the Bureau's headquarter files in Washington, D.C. and that field office records were likely to be "of minimal informational value." [35] Pratt contends that his request did not limit the Bureau's search to its headquarters and consequently that such a search was not responsive.

A Freedom of Information Act search request must "reasonably describe[ ] such records" sought. 5 U.S.C. § 552(a)(3)(A). This requirement relates not only to the reasonableness of the *description* of the subject matter sought, but also to the places to be searched. *Marks v. United States (Department of Justice)*, 578 F.2d 261, 263 (9th Cir. 1978); *Ferguson v. Kelly*, 455 F.Supp. 324, 326 (N.D.Ill.1978). Without this limitation, the Bureau would be required to search every office for every request, an activity that would be both time consuming and expensive. Since Pratt's request did not designate any field offices he wished to be searched, the Bureau was obliged to search only its headquarters files.[36] This was the rationale of and the result reached in *Marks*, at 263, where the Ninth Circuit panel held that the FBI's "willingness to search the records of other specific field offices upon further requests," constituted adequate compliance with the FOIA. The Bureau has expressed the same willingness to Pratt.

---

**32.** Docs. 221–278 (Vol. FF).

**33.** Docs. 279–657(a) (Vols. GG through JJ).

**34.** Docs. 658–1233 (Vols. KK through PP).

**35.** Letter of Quinlin Shea, January 4, 1978, Complaint Ex. IX.

**36.** The Court does not agree with plaintiff's interpretation that it specifically requested a search of ELSUR Logs of particular Bureau

field offices. *See* Affidavit of Jonathan Lubell, ¶ 16. This request, in plaintiff's September 8th letter, Complaint Ex. V, was a request only that the indexes compiled by these offices be searched. The Bureau has represented that this was done and has produced approximately 750 pages as a result. Letter from Allen McCreight, Complaint Ex. XI.

### (2) Incomplete Search of the Bureau's Main Files

█ Plaintiff also alleges that the Bureau's search of its headquarters files was not complete. His attorney, Jonathan Lubell, provides several affidavits which he claims support this allegation and illustrate that summary judgment is premature. On the basis of the affidavits, plaintiff urges the Court to order discovery and direct the government to broaden the scope of its search.

The Byerly affidavit describes the Bureau's central records system and sets out the manner in which a search of the system was undertaken to comply with Pratt's request.[37] Standing alone, the affidavit establishes that the search complied with the FOIA requirements. To avoid summary judgment on the issue of the adequacy of the search, Pratt must make a bad faith showing. *Baez,* at 1335. The two affidavits of plaintiff's counsel focus on several items that allegedly support such a showing. Two of the considerations presented, however, are no more than "bare assertions" that fail to controvert the Bureau's affidavits. These are claims that the FBI failed to disclose documents relating to an unidentified conspiracy to induce Pratt to escape from a Los Angeles County, California, jail in 1974–1975 and documents relating to Pratt's involvement in Black Student Union activities.

Other documents provided and allegations made in the Lubell affidavits, however, present serious questions about the thoroughness of the Bureau's search. Among these proffers are three documents not released to Pratt: (1) a December 19, 1968, letter reporting a meeting of December 18, 1968, of Bobby Seale, "Kathleen" and unidentified persons; (2) a January 9, 1969, letter, discussing an informant's report about a "Geronimo," a Pratt alias, arriving in Oakland, California, from Los Angeles on December 20, 1968; and (3) a January 18, 1971, teletype proposing preparation of a forged letter to Eldridge Cleaver in Algiers designed to cause turmoil within the BPP. Pratt is referred to in this letter by his alias "G". Lubell also provides a copy of a letter from former FBI Director Colwell to California Attorney General Deukmejian, describing documents compiled by the Bureau in monitoring Pratt's trial and trial preparation. These documents have been neither provided nor identified in the current index.

Lubell also relies on the Church Committee Report[38] disclosing FBI covert subversive action against the BPP and other black organizations as evidence, coupled with Pratt's belief that he was framed by the FBI, that the FOIA search was conducted in bad faith. Finally, Lubell alleges on information and belief that two file systems maintained by the Bureau were not searched for documents on Pratt: (1) secret files of information so sensitive that the documents are stamped "Do Not File" and segregated from other records; and (2) "raw reports" of agents and informants; i. e., the reports as originally filed with the Bureau, before reviewed and prepared in any way for inclusion in the main file systems.

Of the three Bureau documents provided by Lubell, one requires further explanation by the agency. The January 18, 1971, teletype refers to Pratt by one of his aliases, yet this document was not disclosed in the index or accounted for in any way once identified by plaintiff. Similarly, the Bureau made no effort to account for the failure of the Vaughn index to identify any documents referred to in the Colwell letter. In contrast, the FBI has presented an affidavit providing that the January 9, 1969, letter was not disclosed because it was located in one of the Bureau field offices.[39]

---

37. Affidavit of David Byerly, ¶¶ (2), (4).

38. Senate Report on the Select Committee to Study Governmental Operations with Respect to Intelligence Activities, *S.Rep.No.94–755,* 94th Cong., 2d Sess. Book III at 185–223 (1976).

39. This explanation was provided in an earlier affidavit by David Byerly in response to a previous motion by plaintiff for production of further documents. Affidavit of David Byerly, ¶ (8), January 28, 1980. The Court denied the motion on February 14, 1980.

And the December 19, 1968, letter contains no reference to Pratt whatsoever, giving no reason to believe the document should have turned up in the Bureau's FOIA search.

The Church Committee Report's conclusion that the BPP was the target of FBI counterintelligence activities also calls the scope of the Bureau's search into question. Pratt's former position of leadership in the BPP is not disputed. Thus, there is every reason to believe that he would be an object of the Bureau's program to undermine the BPP. The agency misconduct revealed by the Church Committee is clearly related to the FOIA search Pratt requested. *Cf. Hayden v. National Security Agency*, 608 F.2d 1381, 1387 (D.C.Cir. 1979) ("The sufficiency of the [Vaughn] affidavits is not undermined ... by past agency misconduct in other unrelated cases"). And although the Bureau has in fact disclosed some "Cointelpro" documents in connection with Pratt's request, *see supra*, at 760–761, the Committee Report calls for a specific explanation of the degree to which Pratt was subjected to the Bureau's counterintelligence program and any documents thereby created.

Lubell's allegations that the FBI maintains secret files and raw reports that were not searched for records on Pratt also rise far above the level of "bare assertions." Indeed, the Bureau's practice of stamping certain documents "Do Not File" was recently made public in another proceeding in this jurisdiction.[40] In the context of such a disclosure, the Bureau must respond and supply a full explanation.

While the items discussed may not establish definitely that the Bureau's search was incomplete, they raise serious and sufficient enough doubts about bad faith to require an explanation. An affidavit, responding to Lubell's claim, should provide plaintiff with the facts he requires to demonstrate whether a dispute of material fact exists over the scope of the Bureau's search. *See Exxon Corporation v. Federal Trade Commission,*

No. 79–1995, slip op. at 11 (D.C.Cir., October 3, 1980). At a minimum the affidavit should provide:

1. A justification for the absence of the January 18, 1971, teletype from the documents disclosed to Pratt;

2. An identification of or justification for the absence of the information on Pratt referred to in the Colwell letter from the Vaughn index;

3. A statement detailing the extent to which plaintiff was subject to FBI covert action as part of its "Cointelpro" program to subvert the Black Panther Party. The statement shall indicate whether any documents not previously disclosed to Pratt were generated by these activities. To the extent these records are not released, the Bureau shall file an itemization justifying nondisclosure in accordance with *Vaughn v. Rosen* ;

4. An explanation of the Bureau's practice of stamping certain documents "Do Not File" and segregating them from the Bureau's main files. The affidavit shall further provide whether such files contain documents pertaining to Pratt. To the extent records on Pratt are not disclosed, the Bureau shall file an itemization of any withholdings in accordance with the *Vaughn v. Rosen* requirements;

5. A statement affirming or denying the existence of "raw reports" files maintained by the Bureau. The affidavit shall further provide whether such files contain documents pertaining to Pratt. To the extent these are not disclosed, the Bureau shall file a similar itemization as required above.

---

**40.** This practice was revealed in the prosecution of two FBI officials for authorizing surreptitious entries into the homes of private citizens in connection with the Bureau's Weatherman investigation. *United States v. Felt*, Cr. No. 78–179, Testimony of Steven Horn, attorney for the Justice Department task force created to investigate the FBI's alleged use of unlawful investigative techniques, TR. 2133–2135 (September 30, 1980).