Elmer G. PRATT,

v.

William H. WEBSTER, Director, Federal Bureau of Investigation, et al., Appellants.

Elmer G. PRATT

v.

William H. WEBSTER, Director, Federal Bureau of Investigation, et al., Appellants.

Nos. 81–1907, 81–1922.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 19, 1981.

Decided Jan. 22, 1982.

Order Filed April 28, 1982.

Susan Sleater, Dept. of Justice, Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., and Leonard Schaitman, Dept. of Justice, Washington, D. C., were on the brief for appellants.

Jonathan W. Lubell, New York City, for appellee. David G. Lubell, Newark, N. J., and William H. Schaap, Washington, D. C., also entered appearances for appellee.

Before MacKINNON, ROBB and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This case is a logical sequel to the decision of this Circuit a little more than a year ago in *Abramson v. Federal Bureau of Investigation*, 658 F.2d 806 (D.C.Cir.1980), *cert. granted*, 452 U.S. 937, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981) (No. 80–1735). In *Abramson* we held, *inter alia*, that documents in the possession of the Federal Bu-

reau of Investigation ("FBI") must satisfy the threshold language of Exemption 7 of the Freedom of Information Act ("FOIA") [1] —"investigatory records compiled for law enforcement purposes"—before any of the constituent parts of Exemption 7 may be asserted as a basis for nondisclosure of agency records requested under the Act. [2] *Abramson*, 658 F.2d at 811–12. Because the District Court in *Abramson* found that certain of the requested records (*i.e.*, "name check" summaries) were compiled solely for *political* purposes, and because the Government did not challenge that finding on review, *see id.* at 810–11, that case presented the question of whether the threshold language of Exemption 7 was to have any application to the FBI. Based on the plain meaning of section (b)(7) of FOIA, we held that it did.

The decision in *Abramson*, however, did not reach one of the principal questions raised by this appeal. Because the Government did not challenge the finding in *Abramson* that the records at issue were not compiled for law enforcement purposes, we had no occasion to pass upon the appropriate judicial test for determining whether documents held by the FBI are indeed "investigatory records compiled for law enforcement purposes." This case, however, requires us to express and apply such a test.

In this case, Elmer G. ("Geronimo") Pratt, a former officer of the Black Panther Party, requested from the FBI all documents and records filed under his name and all other records containing his name or pertaining to him. Through his original request to the FBI, administrative appeals within the agency, and his action in the

District Court, Pratt has obtained over 1,200 documents in whole or in part. At issue on this appeal is the proper treatment to be accorded twenty documents, all of which were generated by the FBI's Counter-Intelligence Program ("COINTEL-PRO") activities directed at the Black Panther Party.

The District Court held that the disputed documents were not the result of "any legitimate law enforcement purpose," *Pratt v. Webster*, 508 F.Supp. 751, 761 (D.D.C. 1981), and hence did not satisfy the Exemption 7 threshold. Although we note that certain of these documents evince illegal FBI practices, we are constrained to find that the records sought derived at least in part from a purpose to enforce and prevent violations of the criminal laws. In light of this finding, we must reverse the decision of the District Court denying the Government's requests for nondisclosure. We remand so that the District Court may consider the proper application of the subparts of Exemption 7 to the twenty documents in question.

## I. BACKGROUND

### A. *Factual Background*

During the late 1960s, plaintiff-appellee Pratt was the Deputy Minister of Defense for the Southern California Branch of the Black Panther Party ("BPP"). During the late 1960s and early 1970s the Black Panther Party was the object of intensive scrutiny by the FBI as an allegedly subversive, and potentially violent, domestic organiza-

---

1. 5 U.S.C. § 552 (1976 & Supp. IV 1980).

2. Exemption 7 of the Freedom of Information Act provides:
   (b) This section does not apply to matters that are—
   . . . .
   (7) *investigatory records compiled for law enforcement purposes,* but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy,

(D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel.

5 U.S.C. § 552(b)(7) (1976) (emphasis added).

tion.[3] Pratt's position in the BPP made his activities a likely subject of concern and surveillance by the FBI.

On July 28, 1972, Pratt was found guilty of murder and robbery in a California state court and, on August 28, 1972, he was sentenced to a term of life imprisonment, which he is presently serving in San Quentin Prison.[4] The murder for which Pratt was convicted occurred on December 18, 1968, in Santa Monica, California. Pratt has consistently maintained his innocence of that crime, claiming that on the night of the murder he was attending a meeting with BPP officials in Oakland, California, several hundred miles from Santa Monica.

Based in part on his belief that the FBI possessed documents that would verify his presence in Oakland on December 18, 1968, and thus substantiate his alibi, Pratt filed two FOIA requests with the FBI. Complaint ¶¶ 3, 8, 12, 25, *reprinted in* Jt.App. at 7–9, 12. On June 5, 1976, Pratt requested then FBI Director Clarence Kelley to provide him with:

All files, records, memoranda, or other data or materials filed under my name or obtainable by your agency by searching through other files and materials for documents which contain my name.

On May 20, 1977, the FBI released 499 partially expurgated pages to Pratt. Pratt appealed certain deletions within the agency and, on September 8, 1977, he made a supplemental request for "any records pertaining to him which may be contained in the Bureau's files concerning" five named

organizations and twenty-two named individuals.

Through his supplemental request and the processing of his administrative appeals, Pratt eventually obtained access to over 1,000 documents, totaling several thousand pages. The FBI deleted portions of many of these documents, claiming that the deletions were justified by Exemptions 1, 2, 7(C), 7(D), 7(E) and 7(F) of FOIA.[5] Because Pratt and his counsel believed that the deletions made in the released documents did not comply with FOIA and that the FBI had not fully searched its files, Pratt instituted this action in the District Court seeking to compel a further search and full disclosure.

### B. *Proceedings in the District Court*

The District Court directed the FBI to submit affidavits, pursuant to *Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), indexing and explaining the agency's deletions. The court determined that the first *Vaughn* index was inadequate and ordered the FBI to submit new and more detailed *Vaughn* filings. These were submitted in November 1979.

On April 6, 1979, while the District Court proceedings were pending, Congressman Paul McCloskey requested the FBI "to determine whether there is any evidence in the files to indicate the possibility of Pratt's innocence or doubt as to Pratt's guilt" of the December 18, 1968 Santa Monica murder. In response to Congressman McCloskey's request, the FBI conducted a search

**3.** *See generally* Senate Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, Final Report, S.Rep.No. 755, 94th Cong., 2d Sess., Book III at 185–223 (1976) [hereinafter cited as Church Committee Report] (chapter titled "The FBI's Covert Action Program To Destroy The Black Panther Party"), *reprinted in* Jt.App. at 316–34.

**4.** The fact that Pratt is presently incarcerated, of course, in no way alters or diminishes his rights under FOIA. *See* 5 U.S.C. § 552(a)(3) (1976); *Moorefield v. Secret Service,* 611 F.2d 1021, 1023 n.2 (5th Cir.), *cert. denied,* 449 U.S. 909, 101 S.Ct. 283, 66 L.Ed.2d 139 (1980).

**5.** FOIA Exemptions 1 and 2 provide:
(b) This section does not apply to matters that are—
(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and
(B) are in fact properly classified pursuant to such Executive order;
.(2) related solely to the internal personnel rules and practices of an agency.
5 U.S.C. § 552(b)(1), (2) (1976). (Exemption 7 is set out in note 2 *supra.*)

of its California field offices.[6] On June 18, 1980, as a result of this search, the FBI released to Pratt 1,290 pages of previously withheld documents.

On February 15, 1980, the FBI moved for summary judgment based on its second *Vaughn* index and the completeness of its document production. On February 12, 1981, the District Court denied the FBI's motion for summary judgment. *Pratt v. Webster,* 508 F.Supp. 751 (D.D.C.1981). The District Court ordered all documents containing redactions based on Exemptions 1 and 7(E) submitted for *in camera* review. 508 F.Supp. at 756–58, 760–61. The deletions from partially disclosed documents based on Exemptions 2, 7(C) and 7(D) were upheld, *id.* at 758–60, with the exception of nine documents generated by COINTEL-PRO activities. The District Court held that these COINTELPRO documents could not "reasonably be considered or interpreted as generated through any legitimate law enforcement purpose," and hence could not "be redacted pursuant to exemption (b)(7)." *Id.* at 761. Finally, the District Court ordered the agency to explain certain inadequacies in its search of FBI Headquarters files and expanded the scope of Pratt's FOIA suit to include all documents generated by COINTELPRO concerning Pratt. *Id.* at 762–64.

In response to an Order of the District Court, dated February 13, 1981, the FBI identified for the court sixteen COINTEL-PRO documents contained in the June 1980 release of documents from the search of FBI California field offices. The FBI also submitted an affidavit and index seeking to justify deletions from twelve of these documents. The agency sought reconsideration of the court's earlier ruling that COINTEL-PRO documents were not "compiled for law

enforcement purposes" and hence not within Exemption 7's purview; in the alternative, the agency claimed that Exemption 6 of FOIA[7] justified the deletions in the additional sixteen and in the original nine COINTELPRO documents.

In a June 16, 1981 Memorandum Opinion, the District Court ordered the release of material from five documents that had been expurgated based on an Exemption 1 claim. Deletions from fifty-seven other documents based on Exemption 1 and from two documents based on Exemption 7(E) were approved after *in camera* review. *Pratt v. Webster,* —— F.Supp. ——, Civ. No. 78–1688, Memorandum Opinion at 2–4 (D.D.C. June 16, 1981), *reprinted in* Jt. App. at 336–38. The District Court also sought further explanation of the scope of the agency's document search. *Id.* at 5–9, *reprinted in* Jt.App. at 339–43. Finally, the District Court refused to alter its previous ruling on the applicability of Exemption 7 to COIN-TELPRO documents, accepted a deletion from one COINTELPRO document based on Exemption 6, and sought further description of the proposed deletions from four other COINTELPRO documents. *Id.* at 9–12, *reprinted in* Jt.App. at 343–46.

On August 7, 1981, the District Court approved the deletion of identifying information from one additional COINTELPRO document based on the FBI's Exemption 6 claim. The District Court also ordered release of the remaining COINTELPRO documents in their entirety, denied the Government's request for a stay of disclosure pending appeal, and granted summary judgment to the defendants in all remaining aspects of the case. *Pratt v. Webster,* Civ. No. 78–1688 (D.D.C. Aug. 7, 1981), *reprinted in* Jt.App. at 377–80.

---

**6.** The FBI searched only its Washington, D. C. Headquarters files in response to Pratt's FOIA requests. Because Pratt was advised of this during the processing of his administrative appeals and did not make a separate disclosure request to each field office, the District Court held that the FBI's failure to expand its original search to all field offices did not make the search irresponsive. *Pratt v. Webster,* 508 F.Supp. 751, 762 (D.D.C.1981).

**7.** FOIA Exemption 6 provides:

This section does not apply to matters that are—

. . . .

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

5 U.S.C. § 552(b)(6) (1976).

The Government appealed to this court from the District Court's Memorandum Opinion and Order of June 16, 1981 and from its Order of August 7, 1981. We issued a stay of the ordered disclosure of the COINTELPRO documents pending appeal. *Pratt v. Webster*, No. 81–1907 (D.C. Cir. Aug. 14, 1981) (per curiam). On appeal the Government challenges only the District Court's disclosure order with respect to the twenty disputed COINTELPRO documents.[8] Thus, the proper treatment of these twenty documents under FOIA Exemptions 6 and 7 is the only issue before us.

## II. LEGAL ANALYSIS OF THE EXEMPTION 7 THRESHOLD

A. *The Existence of an Exemption 7 Threshold for Law Enforcement Agencies*

The Freedom of Information Act was enacted by Congress in 1966, and substantively amended in 1974 and 1976, in order to provide a statutory right of public access to documents and records held by agencies of the federal government. As such, FOIA embodies "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." S.Rep.No.813, 89th Cong., 1st Sess. 3 (1965). Subsection (a)(3) of the Act, under which Pratt has proceeded in this case, requires "each agency" to make available upon request any records it possesses "to any person." 5 U.S.C. § 552(a)(3) (1976).

The broad right of access and disclosure under FOIA is subject to nine exemptions set out in subsection (b), 5 U.S.C. § 552(b) (1976). See 5 U.S.C. § 552(c) (Supp. IV 1980). Like the rest of the Act, all but two of these exemptions on their face apply with equal force and effect to all federal agencies.[9]

■ In this case we are primarily concerned with the appropriate interpretation of one exemption, Exemption 7, as applied to a single agency, the FBI. There is no indication in the threshold language of Exemption 7 that it does not apply to documents held by the FBI. Rather, in all cases Exemption 7 protects from disclosure "investigatory records compiled for law enforcement purposes, but only to the extent that" one of the exemption's subparts applies. This statutory language on its face prescribes a three-part test for withholding information under Exemption 7: In order to be withheld, the material (1) must be an "investigatory record," (2) must have been "compiled for law enforcement purposes," and (3) must satisfy the requirements of one of the six subparts of Exemption 7.[10]

---

**8.** The COINTELPRO documents at issue on appeal are document numbers 22, 519, 520, 521, 521a, 522, 522a, 524, COINT–2, COINT–3, COINT–4, COINT–6, COINT–7, COINT–8, COINT–10, COINT–11, COINT–12, COINT–13, COINT–14, and COINT–15. Document numbers 523, COINT–1, COINT–5, COINT–9, and COINT–16, also generated by COINTELPRO activities, have been released in their entirety. Documents COINT–7 and COINT–12 are apparently identical. Finally, because Pratt has not cross-appealed, the deletions of individual identities from documents 22 and COINT–4 approved by the District Court on the basis of Exemption 6 are not before us.

**9.** One exemption and a part of another apply only to a limited set of agencies. Exemption 8 applies only to agencies "responsible for the regulation or supervision of financial institutions." 5 U.S.C. § 552(b)(8) (1976). Exemption 7(D) allows all agencies to refuse to disclose the identity of a confidential source (if the exemption's threshold criterion is met), but

also allows "a criminal law enforcement authority" conducting a criminal investigation and "an agency conducting a lawful national security intelligence investigation" to withhold all confidential information provided only by a confidential source. 5 U.S.C. § 552(b)(7)(D) (1976). See note 39 *infra*. These two exemptions with specific agency applications are exceptions that prove the rule of the general applicability of the other exemptions.

**10.** *Abramson v. FBI*, 658 F.2d 806, 811–12 (D.C.Cir.1980), *cert. granted*, 452 U.S. 937, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981). The Attorney General's Memorandum on the 1974 Amendments to the Freedom of Information Act, which was written to guide executive departments and agencies in the application of FOIA, adopted a similar separation between the Exemption 7 threshold and the exemption's subparts:

> Once it is determined that a request pertains to "investigatory records compiled for law enforcement purposes," *the next ques-*

The Government contends, however, that the FBI need not establish a law enforcement purpose for its investigatory files in order to qualify its records for redaction under the subparts of Exemption 7. It argues that "the threshold Exemption 7 criterion of 'investigatory records compiled for law enforcement purposes' was meant to define the FBI's files rather than limit the Bureau's potential access to the exemption." Appellants' Brief at 20. The Government primarily relies on two decisions by the First and Eighth Circuits, *Kuehnert v. FBI*, 620 F.2d 662 (8th Cir. 1980); *Irons v. Bell*, 596 F.2d 468 (1st Cir. 1979).[11] In those cases, the courts held:

The character of the materials excluded under Exemption 7 at least suggests that "law enforcement purpose" is as much a description of the type of agency the exemption is aimed at as it is a condition on the use of the exemption by agencies having administrative as well as civil enforcement duties.

*Irons*, 596 F.2d at 474, *quoted in part in Kuehnert*, 620 F.2d at 666.

■ The simplest response to the Government's contention that FBI records *per se*

meet the threshold criterion of Exemption 7 is that that argument has been rejected by this Circuit in *Abramson v. FBI*, 658 F.2d 806 (D.C.Cir.1980), *cert. granted*, 452 U.S. 937, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981).[12] In *Abramson* we were confronted with a FOIA request to the FBI for a group of "name checks," *i.e.*, "summaries of information from FBI files on certain public personalities which had been prepared pursuant to requests received from the White House." 658 F.2d at 808. The District Court in *Abramson* had held that the name checks were not compiled pursuant to any law enforcement purpose, but nevertheless applied Exemption 7(C) to prevent disclosure as "an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) (1976). We reversed, holding, *inter alia*, that documents in the possession of the FBI must nevertheless pass the Exemption 7 threshold before any of the six subparts in Exemption 7 may be applied to prevent disclosure. *Id.* at 811–12.

The Government argues that *Abramson* does not foreclose their contention that records held by the FBI *per se* satisfy the Exemption 7 threshold. Appellants' Brief

tion is whether release of the material would involve one of the six types of harm specified in clauses (A) through (F) of amended exemption 7.

Attorney General's Memorandum on the 1974 Amendments to the Freedom of Information Act 6–7 (Feb. 1975) (emphasis added), *reprinted in* House Comm. on Government Operations & Senate Comm. on the Judiciary, 94th Cong., 1st Sess., Freedom of Information Act and Amendments of 1974 (P.L. 93–502) Source Book: Legislative History, Texts, and Other Documents 516–17 (Jt.Comm.Print 1975) [hereinafter cited as 1975 Source Book].

11. The Government also relies on *Abrams v. FBI*, 511 F.Supp. 758 (N.D.Ill.1981), and on language in *Church of Scientology v. Department of the Army*, 611 F.2d 738, 748 n.5 (9th Cir. 1979), and *Larouche v. Kelley*, 522 F.Supp. 425, 437 (S.D.N.Y.1981). The Government frankly concedes, however, that the language in *Church of Scientology* and in *Larouche* is dicta. Appellants' Brief at 21, 26–27; *see also* note 30 *infra*.

12. The issue directly before the Supreme Court this Term in *FBI v. Abramson*, 452 U.S. 937, 101 S.Ct. 3079, 69 L.Ed.2d 951, is *not* the question of the effect of FOIA Exemption 7's thresh-

old language on documents held by the FBI. The Solicitor General's petition for certiorari to the Court identified the question presented as: "Does information contained in records compiled for law enforcement purposes and privileged from disclosure under Exemption 7(C) of FOIA lose that exempt status when it is incorporated into records compiled for purposes other than law enforcement?" 452 U.S. 937, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981). Thus, the Court is principally concerned in *Abramson* with the "pass through" issue of whether information once contained in an exempt document loses its exempt status when it is recompiled in an otherwise non-exempt document.

Of course, the question presented in a petitioner's brief before the Supreme Court does not operate as a jurisdictional limit on the Court's authority to reach a proper disposition of a case. *See Piper Aircraft Co. v. Reyno*, —— U.S. ——, 102 S.Ct. 252, 261 n.12, 70 L.Ed.2d 252 (1981). Nevertheless, even if the Court should reach beyond the "pass through" issue in *Abramson* and decide that Exemption 7's threshold language has no application to FBI records, that decision would not affect the outcome of this case. *See* section III *infra*.

at 39–41. That argument is simply untenable. If the panel in *Abramson* had accepted the Government's *per se* argument, the documents held by the FBI would have passed the Exemption 7 threshold despite their lack of law enforcement purpose, and the court would have had to consider whether the District Court correctly ruled that Exemption 7(C) justified nondisclosure. Quite the contrary, the *Abramson* court did not reach the Exemption 7(C) question and reversed the District Court because, failing the Exemption 7 threshold, the "name check" summaries were improperly withheld under FOIA. *See Abramson*, 658 F.2d at 812. Thus, the Government's *per se* argument is foreclosed by the plain holding of this court in *Abramson*.[13]

The three-pronged test for Exemption 7 claims that the *Abramson* opinion sets out, 658 F.2d at 811–12, follows from the plain meaning of the statute,[14] is consistent with

---

**13.** The two arguments that the Government makes in an attempt to distinguish *Abramson* are wholly unconvincing. First, the Government notes that three months before the decision in *Abramson* this Circuit had stated that the question whether Exemption 7 applies to documents of a law enforcement agency not compiled pursuant to any law enforcement purpose was an open issue in this Circuit. *Lesar v. Department of Justice*, 636 F.2d 472, 486 n.83 (D.C.Cir.1980) (citing *Irons v. Bell* and *Kuehnert v. FBI*). Based on this observation the Government argues that the *Abramson* panel could not have intended to answer this open question since it failed to cite *Lesar* or the decisions of other Circuits in its written opinion. Appellants' Brief at 39–40. However, to contend that the issues a court decides are determined by the cases it fails to cite is absurd.

Second, the Government argues that *Abramson* decided a different question than the one it now presents about the Exemption 7 threshold criterion. The Government observes that the *Abramson* panel decided the "pass through" question and that this issue is the one now pending before the Supreme Court. *See* note 12 *supra*. While this Circuit did decide the "pass through" question in *Abramson*, that was not the only issue presented. In fact, *Abramson's* brief in this court stated:

The issue is whether the court and/or the government can withhold documents under any subpart of Section b(7) after a court has ruled that there was no law enforcement purpose with respect to the compilation of documents being withheld.

Brief for Appellant at 14, *Abramson v. FBI*, 658 F.2d 806 (D.C.Cir.1980). The Supreme Court's review of only a single issue (in fact, the only issue pursued by the Government) does not deny the presence of others in this court's decision in the case.

Notably, the Government has made no attempt to reconcile its *per se* argument in this case with either the language or the holding in *Abramson*.

**14.** As we recently noted, "[r]esort to the legislative history of a statutory provision is not necessary when the meaning of the provision is plain from its language." *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1056 (D.C.Cir.1981) (en banc); *accord, NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 223, 98 S.Ct. 2311, 2317, 57 L.Ed.2d 159 (1978). Even if we look beyond the statutory language to the legislative history, we find the Government's arguments unconvincing. The Government cites occasions in the legislative history in which the FBI's investigatory files are mentioned as examples of material covered by Exemption 7. Appellants' Brief at 30–34. This is not surprising, since the FBI's investigatory records are *typically* compiled for a law enforcement purpose, and since there is perhaps no better example of the usual application of Exemption 7. "No reference to the FBI or any other particular agency appears in the Act itself, however, and there is no indication that any agency is to be treated differently from another with respect to the (b)(7) exemption." Note, *The Investigatory Files Exemption to the FOIA: The D. C. Circuit Abandons* Bristol-Myers, 42 Geo.Wash.L.Rev. 869, 874 (1974) (footnote omitted). Moreover, the Government has not cited and we have not found any direct suggestion in the legislative history that FBI records generated *without any law enforcement purpose* may be withheld under Exemption 7.

The Government's legislative history argument—that Congress meant to describe FBI files by the threshold language of Exemption 7 rather than to limit the FBI's access to the exemption—further loses credibility on a close reading of the history. In 1973 committee hearings, for example, Assistant Attorney General Robert G. Dixon, Jr. of the Department of Justice Office of Legal Counsel suggested amending Exemption 7 to expand its reach: "If the act is to be amended, perhaps the time has come to put in an exemption expressly covering the files of the FBI and other Federal investigators working with the FBI." *Hearings on H.R. 5425 and H.R. 4960 Before a Subcomm. of the House Comm. on Government Operations*, 93d Cong., 1st Sess. 152 (1973). In 1974, of course, Congress did amend Exemption 7, but it did not expand the exemption's coverage as desired by Assistant Attorney General Dixon.

this Circuit's judicial interpretations of Exemption 7 both before and after the 1974 amendments,[15] and was even adopted as the appropriate interpretation of the exemption in the Attorney General's Memorandum on the 1974 Amendments.[16] If the Government is now suggesting that arguments of public policy require that FOIA be rewritten, those arguments should be directed not to us, but to the Congress.[17] We continue to hold that federal agencies, including the FBI, must meet the threshold requirements of Exemption 7 before they may withhold requested documents on the basis of any of its subparts.

### B. The Definition of the Exemption 7 Threshold Test for Law Enforcement Agencies

Our conclusion that a threshold test exists for the application of FOIA Exemption 7 to documents held by law enforcement agencies is, however, only the beginning of our inquiry. The resolution of this case necessarily requires the expression of that threshold test and its application to the COINTELPRO documents presented here.[18]

### 1. The Deference Accorded Law Enforcement Agencies Claiming a "Law Enforcement Purpose"

While FOIA makes no distinction on its face between agencies whose principal function is criminal law enforcement and agencies with both law enforcement and administrative functions, it would be unnecessarily wooden to treat both groups identically when they claim Exemption 7 as a basis for withholding. In fact, courts often accord different treatment to Exemption 7 claims from different agencies. *E.g., Church of Scientology v. Department of the Army*, 611 F.2d 738, 748 (9th Cir. 1979); *Irons v. Bell*, 596 F.2d 468, 473 (1st Cir. 1979); *Ramo v. Department of the Navy*, 487 F.Supp. 127, 130–31 (N.D.Cal.1979), *appeal docketed*, No. 79–4791 (9th Cir. Aug. 6, 1981) (submission vacated pending Supreme Court decision in *FBI v. Abramson*); *see* Note, *FOIA Exemption 7 and Broader Disclosure of Unlawful FBI Investigations*, 65 Minn.L.Rev. 1139, 1145–49 (1981). This judicial development, most often taking the form of more exacting scrutiny of Exemption 7 claims by agencies whose principal function is not law enforcement, is well-grounded in congressional purpose, common

---

In this case the Department of Justice now argues, without any explanation of Dixon's remarks, that Exemption 7 means exactly what Assistant Attorney General Dixon suggested and what Congress never enacted. We are unpersuaded.

**15.** *See, e.g., Lesar v. Department of Justice*, 636 F.2d 472, 486–87 (D.C.Cir.1980); *Weissman v. CIA*, 565 F.2d 692, 694–96 (D.C.Cir. 1977); *Rural Hous. Alliance v. Department of Agriculture*, 498 F.2d 73, 79–82 (D.C.Cir.1974); *Weisberg v. Department of Justice*, 489 F.2d 1195, 1198, 1202 (D.C.Cir.1973) (en banc), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). *See also Demetracopoulos v. FBI*, 510 F.Supp. 529, 531–32 (D.D.C.1981); *Fonda v. CIA*, 434 F.Supp. 498, 506–07 (D.D.C.1977).

**16.** *See* note 10 *supra*.

**17.** The First Circuit in *Irons* noted that there were "strong policy reasons" for accepting the Government's *per se* argument for FBI documents. *Irons v. Bell*, 596 F.2d 468, 474 (1st Cir. 1979). To the extent that the First Circuit reached its result based on arguments of public policy, we must respectfully disagree with its

approach. This Circuit has consistently held that whether any government document should be disclosed or protected against disclosure is a matter of public policy for legislative determination. It is not for this court to rewrite a statute. *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1066–1067, 1075 (D.C.Cir.1981) (en banc).

**18.** The panel in *Abramson* was not required by the facts of that case to enunciate a test for the Exemption 7 threshold and did not attempt to do so. The District Court in that case declared that "there has been absolutely no showing that these particular records were compiled for law enforcement purposes." *Abramson v. FBI*, Civ. No. 77–2206, Order at 2 (D.D.C. Nov. 30, 1979), *quoted in Abramson v. FBI*, 658 F.2d 806, 811 (D.C.Cir.1980). The Government did not contest that conclusion on appeal, Brief for Appellees at 8 n.5, *Abramson v. FBI*, 658 F.2d 806, 811 (D.C.Cir.1980), and did not pursue that issue after the panel's decision. Petition for Rehearing and Suggestion for Rehearing *en banc* at 2 n.1, 4 n.5, *Abramson v. FBI*, 658 F.2d 806 (D.C.Cir.1980).

sense, and notions of judicial economy.[19] Three related justifications for the differential review can be posited.

First, Congress amended Exemption 7 of FOIA in 1974 in response to a series of decisions by this Circuit that had interpreted the exemption rigidly.[20] These decisions, if left to stand, threatened to exempt large portions of agency files whenever a label of "law enforcement purpose" and "investigatory file" could be attached to agency records.[21] In the view of the Congress, this result would have substantially undercut the Act's disclosure requirements, especially in the context of agencies with both general administrative and law enforcement functions. Congress' amendment of Exemption 7 in 1974 was intended to overrule those judicial decisions and, therefore, evinced in part an intent that the exemption not be read too broadly in its application to agencies with general administrative and regulatory functions.[22]

Second, in its 1974 amendment to Exemption 7, Congress set out six subparts to the exemption representing the potential harms that it believed justified nondisclosure of government investigatory records. These subparts, perhaps predictably, apply more extensively in criminal than in civil law enforcement.[23] Thus, the language of the exemption itself suggests a greater congressional concern with the secrecy of docu-

19. The different treatment accorded to criminal law enforcement agencies under the Exemption 7 threshold is not inconsistent with our rejection of the Government's suggested *per se* approach for these agencies' Exemption 7 claims. The *per se* approach would totally eliminate any threshold requirement for criminal law enforcement agencies and make a mockery of the plain wording of the exemption. In contrast, treating law enforcement and mixed-function agencies differently under Exemption 7 does not judicially erase words from the statute.

20. A brief exchange on the Senate floor between Senator Kennedy, the Floor Manager of the FOIA Amendments, and Senator Hart, the sponsor of the amendment to Exemption 7, identified the decisions as *Weisberg v. Department of Justice*, 489 F.2d 1195 (D.C.Cir.1973) (en banc), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974); *Aspin v. Department of Defense*, 491 F.2d 24 (D.C.Cir.1973); *Ditlow v. Brinegar*, 494 F.2d 1073 (D.C.Cir.) (per curiam), *cert. denied*, 419 U.S. 974, 95 S.Ct. 238, 42 L.Ed.2d 188 (1974); and *Center for Nat'l Policy Review on Race and Urban Issues v. Weinberger*, 502 F.2d 370 (D.C.Cir. 1974). 120 Cong.Rec. 17,039–40 (1974), *reprinted in* 1975 Source Book, *supra* note 10, at 349.

21. On the floor of the Senate Senator Hart quoted from *Center for Nat'l Policy Review on Race and Urban Issues v. Weinberger*, 502 F.2d 370, 372 (D.C.Cir.1974) (footnote omitted):

Recent decisions of this court construing exemption 7 have considerably narrowed the scope of our inquiry. The sole question before us is whether the materials in question are "investigatory files compiled for law enforcement purposes." Should we answer that question in the affirmative, our role is "at an end."

*See* 120 Cong.Rec. 17,034 (1974), *reprinted in* 1975 Source Book, *supra* note 10, at 335–36.

22. In a Memorandum Letter inserted in the *Congressional Record*, Senator Hart sought to relieve opposing Senators' concerns about his proposed amendment's effect on the FBI and identified his primary concern as the unnecessary withholding of information by other regulatory agencies.

Thus, my amendment more than adequately safeguards against any problem which might be raised for the [Federal] Bureau [of Investigation]. The point is that the "law enforcement" exemption has been broadly construed to include any investigation by a government agency of a federally funded or monitored activity. The courts only require that the investigation might result in some government "sanction" such as a cutoff of funds—and not necessarily a prosecution. The investigations of auto defects, harmful children's toys, or federally-assisted hospitals could all be hidden completely from public view, and from criticism of government inaction or favoritism, unless my amendment is adopted. This is the danger which the ABA proposal seeks to correct. These are rarely FBI investigations.

120 Cong.Rec. 17,040 (1974), *reprinted in* 1975 Source Book, *supra* note 10, at 351. *See also* 120 Cong.Rec. 36,626 (1974), *reprinted in* 1975 Source Book, *supra* note 10, at 413–14 (remarks of Rep. Reid).

23. The language of FOIA Exemption 7 is set out in note 2 *supra*. Exemption 7(D), for example, explicitly allows more information to be withheld from documents compiled in the course of a criminal investigation than in a civil investigation, and Exemption 7(F), which seeks to protect law enforcement personnel, has more obvious application in the criminal context.

ments held by agencies, such as the FBI, principally committed to criminal law enforcement.[24]

Third, courts can usually assume that government agencies act within the scope of their legislated authority. This assumption is not the product of wishful judicial thinking, but instead results from our observations over time that, despite occasional and regrettable lapses, government agencies typically go about their intended business. This experience has specific application to the court's consideration of FOIA Exemption 7 claims by different types of federal agencies.

■ On the one hand, the assumption that a mixed-function agency is acting within the scope of its authority tells a court nothing about whether it has met the Exemption 7 threshold requirement of a "law enforcement purpose." Law enforcement, indeed, is often one of such an agency's proper functions, but other functions are also a major part of the agency's day-to-day business. Thus, a court must scrutinize with some skepticism the particular purpose claimed for disputed documents redacted under FOIA Exemption 7. *Ramo v. Department of the Navy*, 487 F.Supp. 127, 131 (N.D.Cal.1979), *appeal docketed*, No. 79–4791 (9th Cir. Aug. 6, 1981) (submission vacated pending Supreme Court decision in *FBI v. Abramson*). If courts accept a mixed-function agency's claims of "law enforcement purpose" without thoughtful consideration, the excessive withholding of agency records which Congress denounced and sought to avoid with the 1974 amendments might well result.

■ On the other hand, the generally accurate assumption that federal agencies act within their legislated purposes implies that an agency whose principal mission is criminal law enforcement will more often than not satisfy the Exemption 7 threshold criterion.[25] Thus, a court can accept less exacting proof from such an agency that the purpose underlying disputed documents is law enforcement. This less exacting judicial scrutiny of a criminal law enforcement agency's purpose in the context of the FOIA Exemption 7 threshold is further bolstered by Congress' concern that inadvertent disclosure of criminal investigations, information sources, or enforcement techniques might cause serious harm to the legitimate interests of law enforcement agencies.[26]

Thus, we conclude that a court may apply a more deferential attitude toward the claims of "law enforcement purpose" made by a criminal law enforcement agency. The result of this conclusion is that our prior precedent identifying the standard for ascertaining law enforcement purpose *vel*

**24.** The Conference Committee on the 1974 amendments added to Exemption 7(D) the language that allows all information from a confidential source as well as the source's identity to be withheld in the case of criminal and lawful national security investigations. *See* note 39 *infra*. It also added Exemption 7(F), which exempts information that might endanger law enforcement personnel. These changes were made "to accommodate unusual requirements of some agencies such as the Federal Bureau of Investigation," 120 Cong.Rec. 34,162 (1974), *reprinted in* 1975 Source Book, *supra* note 10, at 378 (remarks of Rep. Moorhead, House Floor Manager), in response to concerns expressed by President Ford. *See* Letter from President Ford to Senator Kennedy (Aug. 20, 1974), and Letter from Senator Kennedy and Representative Moorhead to President Ford (Sept. 23, 1974), *reprinted in* 120 Cong.Rec. 33,158–59 (1974), and 1975 Source Book, *supra* note 10, at 368–72; H.R.Rep.No.1380, 93d Cong., 2d Sess. 12–13 (1974) (Conference Re-

port), *reprinted in* 1975 Source Book, *supra* note 10, at 229–30. The Congress' special concern for criminal law enforcement agencies was similarly expressed in other passages from the legislative history of the 1974 FOIA amendments. *See, e.g.*, note 22 *supra*.

**25.** The FBI is certainly one of the most obvious examples of such an agency. *See* 28 U.S.C. §§ 531–537 (1976).

**26.** In support of Senator Hart's floor amendment that eventually became Exemption 7, Senator Kennedy commented: "[I]t seems to be that the amendment itself has considerable sensitivity built in to protect against the invasion of privacy, and to protect the identities of informants, and most generally to protect the legitimate interests of a law enforcement agency to conduct [a criminal] investigation ...." 120 Cong.Rec. 17,040 (1974), *reprinted in* 1975 Source Book, *supra* note 10, at 350.

*non* of general regulatory and administrative agencies, while instructive, is not necessarily determinative of the issue for criminal law enforcement agencies. These specialized agencies require a separate standard of judicial review.

### 2. The "Law Enforcement Purpose" of Law Enforcement Agencies

On one of the few occasions that required this Circuit to ascertain the presence or absence of a "law enforcement purpose" for FOIA Exemption 7, in a case involving a mixed-function agency, the court drew a line between general agency oversight (including program monitoring) and agency investigations specifically directed at allegedly illegal activity. *Rural Housing Alliance v. Department of Agriculture*, 498 F.2d 73, 81–82 (D.C.Cir.1974).[27] At issue in *Rural Housing Alliance* was the disclosure of portions of a report by the Department of Agriculture's Inspector General regarding allegations of governmental housing discrimination in Florida. In expressing the "law enforcement purpose" test for the District Court to apply on remand, the court identified law enforcement investigations as "investigations which focus directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved, result in civil or criminal sanctions." *Id.* at 81 (footnote omitted). The panel further stated: "The purpose of the 'investigatory files' is thus the crucial factor. . . . If the purpose of the investigation was . . . an inquiry as to an identifiable possible violation of law, then such inquiry would have been 'for law

enforcement purposes' whether the individual were a private citizen or a government employee." *Id.* at 82.[28]

Because we believe that a court may apply a more deferential standard with respect to claims of "law enforcement purpose" made by a criminal law enforcement agency, the test enunciated in *Rural Housing* is not adequate to dispose of the question at issue here. We must, therefore, consider alternative tests suggested by other courts.

The various courts that have rejected the *per se* argument, *i.e.*, that all law enforcement agency files manifest a law enforcement purpose, have, quite naturally, each phrased their tests in slightly different language. For example, Judge Weinfeld has opined: "The appropriate test is whether the records indicate that the agency was gathering information with the good faith belief that the subject may violate or has violated federal law, or was merely monitoring the subject for purposes unrelated to enforcement of federal law." *Lamont v. Department of Justice*, 475 F.Supp. 761, 773 (S.D.N.Y.1979) (footnote omitted). The Northern District of California announced "a liberal test that would require that the FBI show a sufficient connection between the conduct of the investigation and legitimate concerns for maintaining national security or preventing criminal activity." *Ramo v. Department of the Navy*, 487 F.Supp. 127, 131 (N.D.Cal.1979), *appeal docketed*, No. 79–4791 (9th Cir. Aug. 6, 1981) (submission vacated pending Supreme Court decision in *FBI v. Abramson*).[29]

---

**27.** While *Rural Housing Alliance* is of the same vintage as the four decisions of this Circuit that Congress overruled with the 1974 amendment of Exemption 7, *see* note 20 *supra* and accompanying text, it has retained its precedential value. Congress did not change the "law enforcement purpose" language in *Exemption 7* that was the subject of *Rural Housing Alliance*; instead Congress codified the exemption's policy concerns so that once a law enforcement purpose was found, the judicial inquiry was not "at an end." *See* note 21 *supra*.

**28.** This means of distinguishing investigations for law enforcement purposes from more routine oversight and monitoring has been termed

the "special intensity" test. *See, e.g., Gregory v. FDIC*, 470 F.Supp. 1329, 1333–34 (D.D.C. 1979), *rev'd on other grounds*, 631 F.2d 896 (D.C.Cir.1980) (per curiam); Note, *FOIA Exemption 7 and Broader Disclosure of Unlawful FBI Investigations*, 65 Minn.L.Rev. 1139, 1147 (1981).

**29.** The Court in *Ramo* apparently was willing to go further than some other courts have in discarding the "special intensity" test's requirement of a specific, alleged violation or a particular, suspected person. "To invoke the exemption, the [FBI] need not show that the files reflect a specific suspected violation of the law; however, it must show that the investigation

Shortly after the decision in *Ramo*, the Ninth Circuit stated that: "An agency which has a clear law enforcement mandate, such as the FBI, need only establish a 'rational nexus' between enforcement of a federal law and the document for which an exemption is claimed." *Church of Scientology v. Department of Defense*, 611 F.2d 738, 748 (9th Cir. 1979).[30] Chief Judge Peckham interpreted the language from *Church of Scientology* as requiring "that an agency with a clear law enforcement purpose ... need only be held to a minimal showing that the activity which generated the documents was related to the agency's function." *Dunaway v. Webster*, 519 F.Supp. 1059, 1076 (N.D.Cal.1981). Finally, Judge Weinfeld has tersely commented: "To meet this requirement an agency must demonstrate at least 'a colorable claim of a rational nexus' between activities being investigated and violations of federal law." *Malizia v. Department of Justice*, 519 F.Supp. 338, 347 (S.D.N.Y.1981) (footnote omitted).[31]

■ As we read these various tests, however phrased, and consider the applicable language of FOIA (and the related legislative history), it appears inescapable to us that there are two critical conditions that must be met for a law enforcement agency to pass the Exemption 7 threshold. *First, the agency's investigatory activities that give rise to the documents sought must be related to the enforcement of federal laws or to the maintenance of national security.* To satisfy this requirement of a "nexus," the agency should be able to identify a particular individual or a particular incident as the object of its investigation and the connection between that individual or incident and a possible security risk or violation of federal law. The possible violation or security risk is necessary to establish that the agency acted within its principal function of law enforcement, rather than merely engaging in a general monitoring of private individuals' activities. While Congress intended that "law enforcement purpose" be broadly construed,[32] it was not meant to include investigatory activities wholly unrelated to law enforcement agencies' legislated functions of preventing risks to the national security and violations of the criminal

---

was based on some legitimate law enforcement purpose." 487 F.Supp. at 131.

**30.** While the language from *Church of Scientology* quoted above clearly requires some Exemption 7 threshold test, even for FBI documents, the Government has cited a *footnote* from the same page of the opinion which suggests that the Ninth Circuit accepted the *per se* approach of *Irons v. Bell* and *Kuehnert v. FBI*. The footnote states in part: "*Koch*, however, is not persuasive because the agency involved was the FBI, for whom [sic] a separate showing of 'law enforcement purpose' is unnecessary." 611 F.2d at 748 n.5. As did the court in *Dunaway v. Webster*, 519 F.Supp. 1059, 1075–76 (N.D.Cal.1981), we interpret this apparent inconsistency in favor of the textual language.

**31.** Ironically, the language most often cited or quoted as part of the appropriate test for measuring the law enforcement purpose of a law enforcement agency—"a colorable claim of a rational nexus between the organizations and activities being investigated and violations of federal laws"—originated in *Irons v. Bell*, 596 F.2d 468, 472 (1st Cir. 1979). When the documents presented in *Irons* failed to meet even this threshold test, the First Circuit concluded that a criminal law enforcement agency need not meet any threshold requirement in order to avail itself of Exemption 7's subparts. *Id.* at 474. For the reasons noted above, we reject this position of the First Circuit as patently inconsistent with Exemption 7.

**32.** The Exemption 7 "law enforcement purpose" includes both civil and criminal investigations and proceedings within its scope. *See, e.g., Rural Hous. Alliance v. Department of Agriculture*, 498 F.2d 73, 81 & n.46 (D.C.Cir. 1974). Exemption 7(D)'s reference to "lawful national security intelligence investigation[s]" makes clear that it also extends beyond typical civil and criminal law enforcement. The Conference Report on the 1974 FOIA amendments commented:

"[N]ational security" is to be strictly construed to refer to military security, national defense, or foreign policy. The term "intelligence" in section 552(b)(7)(D) is intended to apply to positive intelligence-gathering activities, counter-intelligence activities, and background security investigations by governmental units which have authority to conduct such functions.

H.R.Rep.No.1380, 93d Cong., 2d Sess. 13 (1974), *reprinted in* 1975 Source Book, *supra* note 10, at 230. *See Stein v. Department of Justice*, 662 F.2d 1245, 1260–61 (7th Cir. 1981).

laws and of apprehending those who do violate the laws. *See Lamont v. Department of Justice,* 475 F.Supp. 761, 774–76 (S.D.N.Y.1979) (seventeen years of generalized monitoring unrelated to law enforcement).

*Second, the nexus between the investigation and one of the agency's law enforcement duties must be based on information sufficient to support at least "a colorable claim" of its rationality.* This second condition is deferential to the particular problems of a criminal law enforcement agency. Such an agency, in order to carry out its functions, often must act upon unverified tips and suspicions based upon mere tidbits of information. A court, therefore, should be hesitant to second-guess a law enforcement agency's decision to investigate if there is a plausible basis for its decision. Nor is it necessary for the investigation to lead to a criminal prosecution or other enforcement proceeding in order to satisfy the "law enforcement purpose" criterion. *E.g., Bast v. Department of Justice,* 665 F.2d 1251, 1254 (D.C.Cir.1981); *Rural Housing Alliance v. Department of Agriculture,* 498 F.2d 73, 82 n.48 (D.C.Cir.1974); *cf. Founding Church of Scientology, Inc. v. Regan,* 670 F.2d 1158, 1161 (D.C.Cir.1981) (enforcement proceeding not required for operation of Exemption 7(D)).[33] Of course, the agency's basis for the claimed connection between the object of the investigation and the asserted law enforcement duty cannot be pretextual or wholly unbelievable. *See Abramson v. FBI,* 658 F.2d 806, 811 (D.C. Cir.1980), *cert. granted,* 452 U.S. 937, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981) (asserting appointment functions of Nixon White House as basis for "name checks" of individuals prominently associated with liberal causes).

Thus, while our measure of a criminal law enforcement agency's "law enforcement purpose" is necessarily deferential, in recognition of the realities of these agencies' duties and the importance of their functions, it is not vacuous. In order to pass the FOIA Exemption 7 threshold, such an agency must establish that its investigatory activities are realistically based on a legitimate concern that federal laws have been or may be violated or that national security may be breached. Either of these concerns must have some plausible basis and have a rational connection to the object of the agency's investigation.

## III. APPLICATION OF THE EXEMPTION 7 THRESHOLD IN THIS CASE

In this case the FBI averred that all of the records responsive to Pratt's FOIA request were "investigatory records compiled for law enforcement purposes." Affidavit of David S. Byerly at 7–10, 35 (Nov. 21, 1979), *reprinted in* Jt.App. at 79–82, 111. The District Court accepted this statement of purpose for all of the documents in the original production except for nine COINTELPRO documents, which it held "cannot reasonably be considered or interpreted as generated through any legitimate law enforcement purpose." *Pratt v. Webster,* 508 F.Supp. 751, 761 (D.D.C.1981). The District Court's February 13 Order led to the inclusion of sixteen additional COINTELPRO documents in this litigation, all of which had previously been identified during the field office search requested by Congressman McCloskey.[34] The District Court similarly concluded that none of these COINTELPRO documents satisfied the Exemption 7 threshold. With the exception of two passages deleted under Exemption 6 as "clearly unwarranted invasions of personal privacy,"[35] the District Court ordered that

**33.** We believe that the Third Circuit's conclusion that " 'law enforcement purposes' must relate to some type of enforcement proceeding, and one that is pending," *Committee on Masonic Homes v. NLRB,* 556 F.2d 214, 219 (3d Cir. 1977) (footnote omitted), has no application to an agency whose principal function is criminal law enforcement. Therefore, we also dismiss the First Circuit's concern, expressed

in *Irons v. Bell,* 596 F.2d 468, 474 (1st Cir. 1979), that the need to shield legitimate law enforcement efforts from harmful FOIA disclosures might lead to frivolous prosecutions.

**34.** *See* note 6 and accompanying text *supra.*

**35.** *See* text at notes 7–8 *supra.*

all twenty-five COINTELPRO documents be released in their entirety. With all respect for the District Court's otherwise exemplary handling of this case, we must disagree.

At the outset, it is clear that the District Court singled out this handful of documents only because they were designated as "COINTELPRO" documents. *See id.* Document 22, labeled as a COINTELPRO document, was the only document found to lack a law enforcement purpose out of a particular file of 156 documents. This entire file was a national security file generated by an investigation "instituted as a result of the FBI receiving information that [Pratt] was engaged in activities which could involve a violation of" 18 U.S.C. §§ 2383–2385 (1976), Affidavit of David S. Byerly at 8 (Nov. 21, 1979), *reprinted in* Jt.App. at 80. Documents 519 to 524 include eight documents, *see* note 8 *supra*, out of more than 400 referring to Pratt that were collected from investigatory files of other individuals or organizations by means of the FBI's "see" or cross references. The FBI averred that "[a]ll 'see' reference documents herein are investigatory records compiled for law enforcement purposes and were collected in the course of lawful national security investigations or other mandated investigations imposed by law." Affidavit of David S. Byerly at 35 (Nov. 21, 1979), *reprinted in* Jt.App. at 111. The District Court accepted the FBI's claim of law enforcement purpose for all of these documents except for the eight bearing the appellation "COINTEL-PRO." *Pratt v. Webster*, 508 F.Supp. at 759–61.

■ We recognize, of course, that Exemption 7 refers to "records" rather than files, 5 U.S.C. § 552(b)(7) (1976), and that the location of a non-exempt document in an investigatory file does not necessarily make that document exempt from FOIA's disclosure requirements. *See* 5 U.S.C. § 552(b) (1976). We believe, however, that the District Court distinguished these nine documents from the other documents contained in the same files not on the FOIA grounds of law enforcement *purpose*, but on the grounds of law enforcement *method*.

■ The FBI's Counter-Intelligence Program has been the subject of congressional inquiry, see Church Committee Report, note 3 *supra*, and of individual litigation, *see, e.g., Black Panther Party v. Smith*, 661 F.2d 1243 (D.C.Cir.1981); *Hobson v. Wilson*, Civ. No. 76–1326 (D.D.C. Dec. 23, 1981) (judgment on verdict to anti-war demonstrators); *Stern v. Richardson*, 367 F.Supp. 1316 (D.D.C.1973). Those proceedings have established that COINTELPRO activities included the use of questionable, and at times illegal, methods. The documents at issue in this case also reveal questionable actions by the FBI to foment distrust and suspicion and to create and enhance dissension within the Black Panther Party. *See Pratt v. Webster*, 508 F.Supp. at 761; Jt.App. at 104–06, 113–41, 229–83. But whatever we may think of the FBI's methods, we cannot conclude therefrom that the COINTELPRO activities involved in this case lacked any law enforcement purpose.

The Church Committee Report's discussion of the FBI's actions against the BPP (offered by Pratt as Exhibit 1 to his May 21, 1981 Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment, *reprinted in* Jt.App. at 316–34) quoted from a February 1968 FBI memorandum expanding the agency's program against what it termed "black nationalist groups," including the BPP. That memorandum described the program's goals as follows:

1. Prevent a coalition of militant black nationalist groups. . . .

2. Prevent the rise of a messiah who could unify and electrify the militant nationalist movement . . . Martin Luther King, Stokely Carmichael and Elijah Muhammad all aspire to this position. . . .

3. Prevent violence on the part of black nationalist groups. . . .

4. Prevent militant black nationalist groups and leaders from gaining respectability by discrediting them. . . .

5. . . . prevent the long-range growth of militant black nationalist organizations, especially among youth.

Church Committee Report, *supra* note 3, Book III at 187, *reprinted in* Jt.App. at 316. While many of the FBI's goals and methods in its COINTELPRO activities against the BPP give us serious pause, we believe that the third goal on this list—the prevention of violence—establishes that law enforcement was a "significant aspect" of the FBI's overall purpose. *See Koch v. Department of Justice*, 376 F.Supp. 313, 315 (D.D. C.1974).

■ In particular, we believe that the documents at issue in this case evince law enforcement as a "significant aspect" of the FBI's purpose.[36] Document 22 is part of an investigatory file based on FBI concerns that Pratt might violate three specific provisions of the Criminal Code. From the record before us, we cannot conclude that that concern was implausible or irrational, especially since the District Court recognized the validity of that concern with respect to the other 155 documents in the file. Documents 519 to 524 were all found in the FBI's "see" reference files and, according to the Government's affidavits, were "investigatory records compiled for law enforcement purposes and were collected in the course of lawful national security investigations or other mandated investigations imposed by law." Affidavit of David S. Byerly at 35 (Nov. 21, 1979), *reprinted in* Jt.App. at 111. While this affidavit is indeed a "minimal showing," it appears sufficient to establish the FBI's concern for possible violations or security risks. *See Dunaway v. Webster*, 519 F.Supp. 1059, 1076 (N.D.Cal. 1981). Our conclusion again is bolstered by the District Court's acceptance of the FBI's law enforcement purpose with respect to all other "see" reference documents.

Documents COINT–1 to COINT–16 were located through the FBI's supplemental search for records concerning Pratt in the agency's California field offices. Several of these COINTELPRO documents are directly related to the documents disclosed from the previous search of FBI Headquarters. For example, document COINT–5 was apparently a supplement by the Los Angeles office to its previously dispatched document 520. *See* Jt.App. at 117–24, 240–41. In addition, the subject matter of these sixteen COINT documents is often the same as is found in documents 519 to 524. In short, these documents, but for their COINTEL-PRO label, are indistinguishable from other FBI documents for which the District Court found a law enforcement purpose. Moreover, these documents provide independent support for a claim of law enforcement purpose. Document COINT–1, for example, discusses cooperation with the Los Angeles Police Department in identifying violations of state and local laws, reports on the arrest of a BPP member for firearms violations, and identifies Pratt "as a possible bomb suspect." Jt.App. at 229–30.

■ Thus, we conclude that the District Court incorrectly distinguished COINTEL-PRO documents from other documents for which it found a law enforcement purpose. While the methods frequently used by the FBI in its COINTELPRO activities offer a ready distinction from more typical means of law enforcement, *FOIA Exemption 7 refers to purposes rather than to methods.* Because law enforcement was a significant aspect of the FBI's purpose, we conclude that the District Court erred in holding that these documents failed to pass the Exemption 7 threshold. Accordingly, we reverse its holding in this regard.[37]

---

**36.** We do not intimate that all COINTELPRO documents would pass the Exemption 7 threshold, or even that all COINTELPRO documents concerning the Black Panther Party would necessarily meet this test. Those issues simply are not before us. We are concerned in this case only with a handful of COINTELPRO documents located in general investigatory files of the FBI.

**37.** In defense of the District Court's decision, Pratt raises an issue not addressed by the court below. He contends that the COINTELPRO documents are not "investigatory records" and therefore fail to meet the Exemption 7 threshold criterion on this ground. Appellee's Brief at 19–27. Pratt takes an unusually narrow

view of the meaning of "investigatory records," however, and his view was not shared by Congress. The Conference Report on the 1974 FOIA amendments noted that the term "intelligence" in Exemption 7(D) "is intended to apply to positive intelligence-gathering activities, counter-intelligence activities, and background security investigations by governmental units which have authority to conduct such functions." H.R.Rep.No.1380, 93d Cong., 2d Sess. 13 (1974) (Conference Report), *reprinted in* 1975 Source Book, *supra* note 10, at 230. Exemption 7(D), of course, is operable only when a document satisfies both parts of the threshold and part 7(D) itself. Hence, Congress' definition of "intelligence" necessarily implies that the term "investigatory records" includes with-

Our conclusion that the twenty COIN-TELPRO documents at issue in this appeal[38] meet the Exemption 7 threshold criterion requires us to return the case to the District Court. On remand the District Court must determine whether the withholding of portions of the contested documents, which the Government seeks on the basis of Exemptions 7(C) and 7(D),[39] is justified.[40]

## IV. CONCLUSION

Because of public interest in the effective disclosure of malfeasance by government agencies, we feel compelled to add a few words about the practical effect of our decision and about the means for redress of any alleged wrongs committed by federal agencies.

■ FOIA requires disclosure of government records to the fullest extent possible and allows the withholding of only so much of the document as fits squarely within an enumerated exemption. In this case, for example, the Government primarily seeks only to delete the names of its FBI Special Agents and the identities of its confidential sources; the FBI's plans to increase discord within the Black Panther Party and to discredit its leaders have been revealed. The public's interest in the disclosure of government malfeasance is therefore not defeated by the FOIA exemptions or by our interpretation in this case of the reach of one of them.

Of course, nothing we say or hold represents our approval of the measures attributed to the FBI's Counter-Intelligence Program by the Church Committee Report, note 3 supra. The use of government force and deception to quash lawful political dissent and expression is antithetical to a democratic society. Where substantiated, we find these actions reprehensible.

■ The proper and most effective means of redress for these actions, however, is not a FOIA action. While a suit under the Freedom of Information Act is an important mechanism for discovering the malfeasance of government agencies, see, e.g., Stern v. Richardson, 367 F.Supp. 1316 (D.D. C.1973) (disclosing existence of COINTEL-PRO), it can do no more than reveal these actions. FOIA is thus a useful supplement to, but not a substitute for, private damage actions by aggrieved individuals and political action by concerned citizens and their representatives. The Church Committee Report is a prime example of the latter, and

in its scope records generated by positive intelligence-gathering and counter-intelligence, as well as by a more typical criminal investigation. On this basis we conclude that the COIN-TELPRO documents at issue in this appeal, like the documents which surrounded them in the FBI's files, are "investigatory records" within the meaning of the Exemption 7 threshold.

**38.** See note 8 supra.

**39.** Exemption 7(D) allows the deletion of the name of a confidential source and any information that would disclose the identity of a confidential source whenever a document is an "investigatory record[ ] compiled for law enforcement purposes." If the record was "compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation," Exemption 7(D) also allows the withholding of "confidential information furnished only by the confidential source." 5 U.S.C. § 552(b)(7)(D) (1976); see Radowich v. United States Attorney, 658 F.2d 957, 959 (4th Cir. 1981); Duffin v. Carlson, 636 F.2d 709, 712 (D.C.Cir.1980) (distinguishing two clauses of Exemption 7(D)). These additional requirements are more exacting than the threshold requirement of "law enforcement purpose," Dunaway v. Webster, 519 F.Supp. 1059, 1076, 1080 (N.D.Cal.1981), and, in the case of a national security intelligence investigation, may require a determination of the lawfulness of the investigation's methods. See H.R.Rep.No.1380, 93d Cong., 2d Sess. 13 (1974) (Conference Report), reprinted in 1975 Source Book, supra note 10, at 230; 120 Cong.Rec. 34,167 (1974), reprinted in 1975 Source Book, supra note 10, at 391–92 (colloquy of Rep. Horton and Rep. Moorhead). We leave these issues for the District Court to consider on remand.

**40.** Our disposition of this case on Exemption 7 grounds makes it unnecessary for us to consider the Government's Exemption 6 claims. The Government has asserted Exemption 7(C) or Exemption 7(D) or both as a basis for the deletions from each of the thirteen documents for which it also asserts Exemption 6. Because everything that can be withheld on the basis of Exemption 6 as "a clearly unwarranted invasion of personal privacy" can also be withheld on the basis of 7(C) (if the threshold is met) as "an unwarranted invasion of personal privacy," Exemption 6's application would not allow the deletion of any additional information from these COINTELPRO documents.

a recent case in the District Court for the District of Columbia exemplifies the former, *Hobson v. Wilson*, Civ. No. 76–1326 (D.D.C. Dec. 23, 1981).[41] Our holding in this case in no way limits access to either of these remedies.[42]

## V. DISPOSITION

For the foregoing reasons, we hold that the twenty COINTELPRO documents at issue in this appeal meet the "law enforcement purpose" criterion of the FOIA Exemption 7 threshold. As a result, we reverse the decision of the District Court in this regard and remand the case to the District Court for its consideration of the Government's claims for nondisclosure under Exemptions 7(C) and 7(D) and for any other proceedings consistent with this opinion.

*So ordered.*

## ORDER

MacKINNON, Circuit Judge. A government motion requests the panel to modify its opinion insofar as it discusses the *per se* rule because otherwise "it creates the real prospect that the FBI will be ordered to disclose confidential sources" notwithstanding the great protection given confidential sources by 5 U.S.C. § 552(b)(7). I consider such possibility to be exceedingly remote, if not practically non-existent, considering the numerous protections for confidential sources, confidential information, and, investigative techniques and procedures, *id.*, (E), that are set forth in § 552 and the Privacy Act, § 552a. *See Duffin v. Carlson*, 636 F.2d 709 (D.C.Cir.1981). Our opinion does not constitute a holding beyond the facts that are necessarily involved. And to the extent that any reference is made to the jury verdict in *Hobson v. Wilson* in the District Court, Civ. No. 76–1326 (D.D.C. Dec. 23, 1981), same should be considered as descriptive only and *not* to constitute any expression of our views on the merits of any factual or legal issue involved therein.

Judge ROBB concurs in this statement.

41. In *Hobson* a jury awarded more than $700,-000 to seven community activists and an antiwar organization that had sued the FBI and the District of Columbia Police Department for illegal harassment and surveillance under COINTELPRO. *See Jury Awards $711,937.50 to Demonstrators,* Washington Post, Dec. 24, 1981, at 1, col. 3.

42. Although he does not disagree with the views expressed in the last two paragraphs of this section IV, Judge Robb believes the expression of these views is unnecessary to the decision.